IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JOHNSON CARTER,

    Plaintiff,

v.

CARLA GRIGGS,

    Defendant.

OPINION & ORDER

16-cv-252-wmc

---

*Pro se* plaintiff Johnson Carter is proceeding in this civil lawsuit on Eighth Amendment and Wisconsin negligence claims against defendant Carla Griggs for her alleged failure to treat Carter's collarbone and shoulder injury while he was incarcerated at Jackson Correctional Institution ("JCI"). Griggs has filed a motion for summary judgment. (Dkt. #57.) For the following reasons, that motion will be denied, the trial date in this matter of May 21, 2018, will be struck and the court will recruit counsel to represent the plaintiff.

## UNDISPUTED FACTS[1]

Plaintiff Johnson Carter is no longer incarcerated, but was incarcerated at JCI during the relevant time period. Defendant Carla Griggs was employed by the Wisconsin Department of Corrections ("DOC") as a registered nurse at JCI.

---

[1] The following facts are undisputed unless otherwise noted. The court has drawn these facts from the parties' proposed findings of facts and responses, along with the cited evidence.

I.  Carter's basketball injury and treatment

On May 7, 2013, an officer called the HSU to report that Carter had fallen and hurt himself on the recreation field, and to ask if Carter could be seen. Carter arrived in the HSU a few minutes later where Nurse Griggs examined him. The parties offer very different versions of Carter's examination that day. According to Griggs' declaration and her contemporaneous notes, when he arrived in HSU, Carter was not in acute distress; rather, he walked in. (Griggs Decl. (dkt. #61); Ex. 1000 (dkt. #61-1) at 13-14.) Carter then reported that he had fallen on blacktop playing basketball, landing on his right upper arm and palms. While Carter complained about right shoulder pain, reporting a 5 out of 10 on the pain scale, Griggs noted: (1) that Carter was able to remove his shirt independently for an exam; (2) his right arm and shoulder had full range of motion; (3) he showed equal grip strength; and (4) he appeared to have no deformities or abnormalities in his shoulder or joint.

At that first visit, Griggs diagnosed Carter with an "alteration in comfort," meaning that he was having discomfort, and an "alteration in skin integrity," meaning that he had abrasions on his hands from the fall. Based on this diagnosis, Griggs claims that she cleansed his hands, applied antibiotic ointment and gave him a tetanus vaccination, but did not give him a work restriction because she saw no reason to do so. While Griggs concluded that Carter should be able to deal with the discomfort, she still recommended treatment with ice and ibuprofen, and she told Carter to submit a Health Service Request ("HSR") if he did not see any improvement.

Griggs believed that her diagnosis and treatment aligned with the guidance given by the nursing Musculoskeletal Protocol. While Griggs agrees the Protocol would require referral to a medical provider for same-day evaluation if the patient presents with limitations in range of motion, severe pain and deformity, she reports not observing any of those symptoms during Carter's exam.

In contrast, Carter's version of the parties' first encounter is drawn only from statements in his affidavits. (Carter decl. (dkt. #66).) To begin, Carter avers that his fall caused a compound fracture of his collarbone, and when he arrived at the HSU, he was bleeding down his shoulder where the bone was sticking out. Carter also represents that he was holding his right arm to keep it from moving because he was in so much pain, and that he was bent over. Carter further recalls telling Griggs that he had heard a "pop," but that Griggs did not examine his bone. Carter further maintains that he never removed his shirt, because he was unable to do so.

At that point, Carter further claims that he asked to go to the Black River Falls Hospital, but that Griggs refused. Instead, Griggs told him that there was nothing they could do for a collarbone injury, and that she specifically said, "You are the one who has been contacting Senator Lena Taylor on us. There is nothing we can do for you. You will just have to let it grow back like that." (*Id.* at 2.) Griggs denies each of those statements. She avers instead that while Carter complained about his shoulder, he did not mention anything about his collarbone. Additionally, Griggs does not recall Carter asking to be seen by a physician on an emergency basis, stating that if Carter had made such a request, she would have notified a physician to make that determination.

3

## II. Carter's subsequent HSR's and HSU visits

After Carter left the HSU, there is no dispute he submitted an HSR that same day, asking for a work restriction because he was unable to lift his arm. The next day, May 8, Griggs denied his request, citing their conversation the day before in which Griggs told Carter that he did not need the restriction. In particular, Griggs explains in her affidavit that a work restriction was unnecessary because Carter had not reported being unable to lift his arm.

Carter submitted another HSR on May 16, nine days after his injury, asking when his next doctor's appointment was scheduled and requesting additional pain pills. He also stated in the request that the ibuprofen was giving him pain in the left side of his chest and did not work well. The next day, another nurse, Georgia Kostohryz responded to Carter's HSR by issuing him acetaminophen. Griggs avers that she never received this request.

On May 29, now some 22 days after injury, Carter sent another HSR, asking when he would been seen by a physician about his cholesterol and right shoulder pain. He also asked for more acetaminophen. Griggs responded to the HSR on May 30, noting that Carter was rescheduled to see a doctor the next week and refilling his acetaminophen prescription. She did not follow up with him about his shoulder pain at that time.

On June 7, September 3, and October 1 of 2013, JCI nursing staff saw Carter. The records of those visits do not include a note that Carter complained about shoulder pain or an inability to perform activities of daily living. Again, Carter disputes this, averring

4

that he mentioned right shoulder pain during each of these visits but did not pursue the issue further for fear of being punished.

On September 14, 2013, Carter had also submitted an HSR in which he requested medications and an updated "TENS" unit, which had been issued to him previously for back pain.[2]  On September 15, Griggs responded "Done," meaning that she had taken care of his requests.  On September 16, Griggs obtained an order from Dr. Hannula to extend Carter's TENS unit for one year.  After that date, Griggs received no other HSR's from Carter relating to his right shoulder.

### III. Carter's December 2013 x-ray, diagnosis and subsequent treatment

On November 29, 2013, now some six and a half months after his injury, Carter appears to have been seen for the first time by a physician about right shoulder pain that he reported had persisted since "about June" after falling on the basketball court.  (Ex. 1000 (dkt. #61-1) at 8.)  Dr. Martin noted "Prominent distal clavicle," meaning that the end of the clavicle that fits into the shoulder joint was elevated or higher than it normally would be.  Dr. Martin further noted that there was a one degree separation, which Griggs explains is a widening of the space between where the collarbone meets the shoulder joint. (Griggs decl. (dkt. #61) ¶ 29.)   Griggs further explains that a first-degree shoulder

---

[2] "TENS" is defined as Transcutaneous Electrical Nerve Stimulation, and it is used to treat some types of chronic pain by sending pulses of battery-generated electrical current to key points on a nerve pathway via electrodes taped to the skin.  *See* https://www.mayoclinic.org/tens/img-20006686 (last visited April 20, 2018).

separation is from a strain on the ligaments of the joint, which causes a widening of the joint space when the joint meets, not from a break or fracture in a bone. (*Id.* ¶ 29.)

Due to this assessment, Dr. Martin ordered an x-ray of Carter's right shoulder, benzoyl peroxide for a skin issue and simothicone for Carter's upset stomach. Dr. Martin did not order anything for Carter's pain, nor did he order an activity restriction. As a result, Carter continued on the pain medication he had been taking since May 7.

Carter underwent an x-ray on December 4, 2013. The radiology report noted that the x-ray showed a narrowing of the joint space due to mild degenerative changes, but that it did not show a shoulder fracture, separation or dislocation. (Ex. 1000 (dkt. #61-1) at 18, 46.) Dr. Martin saw him again on December 10, afterwards noting the minimal separation in the shoulder joint and recommending physical therapy to improve the range of motion in his right shoulder. Griggs submitted records of Carter's subsequent physical therapy appointments, which show that Carter began physical therapy mid-December, but as of January 17, 2014, he did not believe it was helping and reported still having pain and difficulty sleeping and dressing himself. (*Id.* at 29-38.) On January 22, 2014, Carter saw Dr. Martin again, at which point Carter reported that his shoulder had not improved and requested to get an orthopedic evaluation. Again, Dr. Martin declined to prescribe additional pain medication or an activity restriction.

On March 19, 2014, now more than ten months after the injury, nurse practitioner Don Foncree examined Carter and ordered a series of x-rays to evaluate the possible separation and requested an appointment with an orthopedic specialist. Foncree continued Carter on the same pain medication, while declining to order an activity restriction. On

March 26, 2014, Carter underwent weight-bearing x-rays that showed a third degree separation of the shoulder joint. Griggs acknowledges that this x-ray showed that there was a larger joint space than diagnosed by Dr. Martin. As a result, Carter was referred to Wisconsin River Orthpaedics for a consult.

On May 1, 2014, approximately one year after injury, Carter was ultimately examined by an orthopedist, Dr. Todd Duellman, who opined that Carter had a right shoulder joint separation. (Ex. 1000 (dkt. #61-1) at 22-24.) Dr. Duellman reported that Carter rated his pain "a 7 out of 10 and has some pain at night," which "comes and goes and he has occasional sudden onsets of sharp pain." (*Id.* at 22.) Upon examination, Dr. Duellman noted that there were no problems or pain at the shoulder joint or near the shoulder separation and "no pain with active range of motion. AROM flexion = 170." (*Id.* at 23.) Dr. Duellman wrote that he did not believe that surgical intervention was necessary, nor did he recommend any activity restrictions, but Duellman did recommend "activity as tolerated" with respect to the "trigger point and pain location." (*Id.* at 23.) He also recommended that Carter continue taking anti-inflammatories that Dr. Martin and Griggs previously ordered, as well as a topical cream. Dr. Duellman concluded by stating that he did not need to see Carter again unless something changed significantly in the future.

Despite Dr. Duellman's conclusions, Carter insists that his shoulder healed in a deformed fashion and still needs corrective surgery. Additionally, while not reflected in any of the medical records, Carter insists that none of the prescribed pain medications helped ease the pain. Finally, attached to Carter's opposition brief is a record from an

7

examination he underwent on February 1, 2016 at Good Samaritan Health Care in Wausau, Wisconsin. While Carter does not authenticate or explain its import, the record includes an impression by Dr. Kenneth Sullivan that he saw "[e]vidence of what is likely a remote right acromioclavicular separation with possible postoperative changes." (Ex. 2 (dkt. #64-2) at 1.) While Carter has not averred that Dr. Sullivan modified any of Carter's diagnoses or actually recommended that Carter undergo surgery, he appears to attach it to support his assertion that his shoulder injury required surgery.

OPINION

The court granted plaintiff leave to proceed against the defendant on an Eighth Amendment deliberate indifference and Wisconsin negligence claim. Defendant seeks judgment in her favor on the basis that the record does not support a finding of either deliberate indifference or medical malpractice.

I. **Eighth Amendment**

Prison employees violate an inmate's rights under Eighth Amendment if they are "deliberately indifferent" to a "serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). Defendant does not dispute that plaintiff's shoulder injury constituted a serious medical need, instead arguing that the treatment provided did not constitute deliberate indifference as a matter of law. Deliberate indifference is more than medical malpractice; the Eighth Amendment does not codify common law torts. *See King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) ("[M]edical malpractice does not become a constitutional violation merely because the victim is a prisoner.") In particular, an inmate's, or even

another doctor's, disagreement with a medical judgment, incorrect diagnosis or improper treatment resulting from negligence is insufficient to state an Eighth Amendment claim. *Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997).

While deliberate indifference requires more than negligent acts, it also requires something less than purposeful acts. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). The point between these two poles lies where "the official knows of and disregards an excessive risk to inmate health or safety," or where "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he . . . draw[s] the inference." *Id*. at 837; *see also Petties v. Carter*, 836 F.3d 722 (7th Cir. 2016) ("While evidence of malpractice is not enough for a plaintiff to survive summary judgment on an Eighth Amendment claim, nor is a doctor's claim he did not know any better sufficient to immunize him from liability in every circumstance."). A jury can "infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("A prisoner may establish deliberate indifference by demonstrating that the treatment he received was 'blatantly inappropriate.'") (citing *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005)).

Recent decisions from the Seventh Circuit underscore the difficulty of applying this standard at summary judgment stage in circumstances where a prisoner challenges treatment decisions. In *Petties*, the court held that a trial was necessary to evaluate a doctor's delay in treating a prisoner's ruptured tendon, despite the fact that the prisoner

9

received consistent medical care. 836 F.3d at 731-32. Following a rehearing *en banc*, Judge Williams wrote for the six-judge majority that "a medical decision that has no support in the medical community, along with a suspect rationale provided for making it," could support a finding of deliberate indifference. *Id.* Elaborating, Judge Williams provided examples of conduct that could support a finding of deliberate indifference: when a doctor refuses to take instructions from a specialist; when a doctor fails to following an existing protocol; when a provider persists in a course of treatment known to be ineffective; when a doctor chooses an "easier and less efficacious treatment" without exercising professional judgment; or an inexplicable delay that does not serve a penological interest. *Id.*

With that as guidance, the court turns to the facts here, resolving all reasonable disputes in plaintiff's favor. As an initial matter, there is no question that defendant provided plaintiff with *some* treatment on May 7, 2013, so the operative question is whether her treatment decision was so inappropriate that it lacked any basis in professional medical judgment. Construing the record in the light most favorable to plaintiff, as it must at this stage, a reasonable fact-finder could infer that defendant's failure to refer plaintiff to a medical provider at that point was departure of protocol constituting deliberate indifference.

Defendant urges the court to ignore plaintiff's averments as to how he presented to defendant on May 7, 2013, because plaintiff failed to cite any corroborating documents or other evidence that would permit a jury to find in his favor. *Spring v. Durflinger*, 518 F.3d 479, 484-85 (7th Cir. 2008). Defendant's argument has merit, but only as to plaintiff's assertion that he presented with a compound fracture. Indeed, *none* of the medical records

that the parties submitted, including the x-rays, remotely suggest that plaintiff ever suffered from *any* sort of broken bone, much less a broken bone that had broken his skin and left him bleeding. Rather, the subsequent x-ray reports note a separation in plaintiff's shoulder, and plaintiff's report from Good Samaritan Health Care confirm that separation, but none of the reports, nor any of *plaintiff's* subsequent complaints or medical records, would permit a reasonable trier of fact to find that plaintiff's collarbone had been broken, much less that defendant should have diagnosed or treated him for a broken bone on May 7, 2013. (Ex. 1000 (dkt. #61-1) at 40-46.)

That said, not everything that plaintiff avers can be so readily rejected on summary judgment. Rather, plaintiff's statements in his affidavit create multiple, reasonable, points of dispute regarding the May 7, 2013, examination. Compound fracture aside, plaintiff presented with more severe symptoms than those defendant recorded, and defendant made statements suggesting that she did not want to treat him. Unlike defendant's version of their interaction, plaintiff avers that: (1) he came into the HSU bent over holding his arm; (2) he did not have a full range of motion; (3) he told defendant that he heard a "pop" when he fell; (4) he asked to go to the hospital but defendant refused; (5) defendant complained about plaintiff having previously contacting Senator Taylor; and (6) defendant told him that there was nothing she could do for him.

If believed, plaintiff's version of events permit an inference that on May 7 when defendant examined him, he could not complete a full range of motion, permitting an inference that defendant failed to follow the Musculoskeletal Protocol that would have required her to refer him to another medical provider for assessment. Furthermore,

11

plaintiff's version of events suggests that defendant's actions or inactions may not have been just the product of carelessness or recklessness, but of her apparent frustration with and in retaliation for plaintiff complaining to Senator Taylor about his medical care.

Defendant argues that even setting aside these disputes, her treatment did not exhibit deliberate indifference because each of plaintiff's subsequent providers offered the same or similar treatment. Again, there is substantial merit in this argument. The record certainly shows that plaintiff's course of treatment remained the same -- in particular, his medications and lack of any activity restriction were consistent -- but that does not necessarily absolve defendant from her failure to take more immediate steps to address his shoulder injury. For one, plaintiff disputes the validity of the treatment decisions following the May 7, 2013, visit with defendant, and the records of those visits do indicate that plaintiff was consistently complaining about his shoulder injury and related pain, including plaintiff's May 30 HSR --that defendant herself handled -- in which he asked not only for information about when he would see a doctor, but reiterated that his shoulder was in pain. Therefore, the court cannot simply conclude that plaintiff's injury was no longer an issue after the initial visit because the treatment plan did not change. To accept that the records accurately reflect plaintiff's actual pain level would require the court to accept defendant's version of events, which stand in stark contrast to plaintiff's version, that he was in continual pain and the medications were not helping his symptoms. The court cannot make that determination; a jury will have to decide whether to credit plaintiff's description of the events, his symptoms and pain level over defendants' version of how he presented in May of 2013.

Additionally, defendant's argument ignores the fact that after Dr. Martin finally examined plaintiff in November of 2013, he referred plaintiff to physical therapy in an effort to improve plaintiff's range of motion. This referral supports two findings that preclude summary judgment. First, Dr. Martin's note acknowledged that plaintiff had a limited range of motion, which lends credence to plaintiff's claim that when defendant examined him immediately after his injury that he exhibited a similar or more restricted range of motion. Second, Dr. Martin's December 2013 referral to physical therapy poses the possibility plaintiff could have started his physical therapy months earlier. Given that plaintiff subsequently reported physical therapy was not helping his pain or ability to complete tasks that required a full range of motion, it is conceivable that the six-month delay in access to physical therapy worsened plaintiff's shoulder condition, or made physical therapy less helpful. As it is well established that a delay in treatment may amount to deliberate indifference if it worsens a prisoner's injury or prolongs pain, defendant's failure to refer plaintiff to a doctor in May of 2013 could support a finding of deliberate indifference. *See Lewis v. McLean*, 864 F3d 556, 563 (7th Cir. 2017) (reaffirming that even a brief delay in treatment "may show deliberate indifference if it exacerbated the inmate's injury or unnecessarily prolonged his pain," ultimately holding that a 1.5 hour delay in treatment could be deliberate indifference ); *Perez v. Fenoglio*, 792 F.3d 768, 777-78 (7th Cir. 2015).

Finally, defendant's qualified immunity defense fails on this record. Qualified immunity protects government employees from liability for civil damages for actions taken within the scope of their employment unless their conduct violates "clearly

established . . . constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "In determining whether a constitutional right has been clearly established, it is unnecessary for the particular violation in question to have been previously held unlawful." *Lewis v. McLean,* 864 F.3d 556, 563 (7th Cir. 2017) (citing *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). "it has long been clear that deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment." *Id.*

Here, if plaintiff's version of defendant's treatment decisions is believed, then she arguably failed to follow proper referral protocol and refused to provide proper treatment for non-medical, even impermissible, reasons, both of which supports a finding of deliberate indifference. Therefore, defendant is not entitled to qualified immunity and her motion for summary judgment as to the Eighth Amendment claim will be denied.

## II.   Wisconsin Negligence Claim

As to plaintiff's state law claim, defendant does not argue the merits. Instead, she seeks judgment on the ground that Wisconsin does not recognize medical malpractice claims against Griggs because she, as a registered nurse, is not covered by the Wisconsin medical malpractice statute. *See* Wis. Stat. § 655.002(1). As an initial matter, it is worth pointing out that while plaintiff sought leave to proceed on a "medical malpractice" claim, and the court granted him leave to proceed on a "negligence" claim, this is a distinction without a difference here, since both claims relate to the same medical care decisions by defendant. Indeed, negligence and medical malpractice claims require proof of the same

four elements: (1) a breach of (2) a duty owed (3) that results in (4) harm to the plaintiff. *Paul v. Skemp*, 2001 WI 42 ¶ 17, 242 Wis.2d 507, 625 N.W.2d 860. And while defendant is correct that § 655.001(1) does not list registered nurses as a "health care provider" covered by Wisconsin's medical malpractice statute and procedures, Wisconsin law does not appear to support dismissal of this claim altogether.

While defendant argues that Wisconsin Statute Chapter 655 is the exclusive remedy for medical malpractice claims in Wisconsin, it is the exclusive remedy for medical malpractice claims against "health care providers" defined by that statute. *See Czapinkski v. St. Francis Hosp., Inc.*, 2000 WI 80, ¶ 14, 236 Wis. 3d 316, 325. Generally speaking, while privately employed registered nurses like the defendant are not listed health care providers under § 655.002(1), they qualify as "health care provider employees" under § 655.005, and thus are swept under the umbrella of § 655 by virtue of their employment with an individual or entity listed in one of the "mandatory participation" subsections of § 655.002(1).

A further complication is defendant's status as a state employee working at JCI. Section 655.003(2) specifically exempts Wisconsin correctional institutions from mandatory participation in Wisconsin's medical malpractice procedures. However, defendant has not cited, and the court has been unable to locate, a case or statute precluding a plaintiff from pursuing a common law medical malpractice claim against a state-employed individual *not* covered by § 655. In fact, while Wisconsin courts appear not to have definitely addressed this narrow issue, at least the Wisconsin Court of Appeals appears to have acknowledged that common law medical malpractice claims against state-

15

employed nurses *are* still cognizable. *See Estate of Radley ex rel. Radley v. Ives*, 298 Wis. 2d 551, 727 N.W.2d 375 (Wis. Ct. App. 2006) (addressing whether notice of claim asserting medical malpractice claims against two state-employed nurses was sufficiently clear). Accordingly, the court cannot conclude that plaintiff's state law claim fails at the outset.

Although defendant has not argued the merits of this claim, summary judgment is, therefore, inappropriate on this record for that claim as well. Given that this standard of proof is lower than the Eighth Amendment deliberate indifference standard, and the court concluded that there are factual disputes warranting a trial as to that claim, the same holds true as to plaintiff's negligence claim as well. Therefore, defendant's request for summary judgment as to plaintiff's Wisconsin negligence claim will be denied as well.

Having so ruled, the court would be remiss not to note the substantial hurdles that faces plaintiff as he proceeds to trial in this matter. Not only would his credibility be placed in doubt by virtue of his apparent, extreme exaggeration of his symptoms when he presented to the defendant on May 7, 2013, but the defendant's more limited role as a nurse operating under supervision of a medical doctor and the consistency of subsequent treatment by others would likely doom plaintiff's claims at trial, especially without a medical expert supporting his claims of deliberate indifference and negligence. Still, if the plaintiff presented with severe shoulder pain and limitation in his range of motion, a lay jury *might* find the defendant acted with deliberate indifference by not at least consulting a physician. Accordingly, the court has determined that this case justifies recruitment of counsel.

ORDER

IT IS ORDERED that:

1. Defendant Carla Grigg's motion for summary judgment (dkt. #57) is DENIED.

2. The deadlines in this case, including the trial date, are STRUCK.

3. The court will attempt to recruit pro bono counsel to represent the plaintiff.

Entered this 20th day of April, 2018.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge