IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JOHNSON CARTER,

                Plaintiff,

   v.

CARLA GRIGGS,

                Defendants.

OPINION AND ORDER

16-cv-252-wmc

---

Plaintiff Johnson Carter is proceeding to trial in this civil action on Eighth Amendment and Wisconsin negligence claims against defendant Carla Griggs for her alleged failure to treat his shoulder injury in 2013 while incarcerated at Jackson Correctional Institution. Trial will begin on November 4, 2019, at 9:00 a.m., and the court will hold the final pretrial conference on October 28, 2019, at 10:00 a.m. Having reviewed the parties' pretrial submissions, this order will provide proposed voir dire, jury instructions, and special verdict (all attached). The order also addresses the pending motions in limine. During the final pretrial conference, the court will hear additional argument on the court's proposed materials, hear further argument on defendant's objection to plaintiff's deposition designation, and go over trial logistics.

I.     Voir Dire

The court has included the majority of the parties' proposed questions. As for plaintiff's proposed voir dire, defendant first objects to plaintiff's proposed statement of the case. The court has modified the proposed language to reflect more closely Carter's Eighth Amendment claim. While plaintiff has not included any proposed language or

instructions related to Carter's negligence claim, the court has assumed this to be an oversight and has included negligence placeholders where appropriate.

Defendants also object to plaintiff's proposed questions 6, 8, 11, 12, 13, 15, 17 and 18. The court has included question 6, asking about experience with ex-offenders, since Carter is no longer imprisoned and this question is not wholly duplicative of question 10, asking more narrowly about being a victim of a crime. As for a family members' work at a law firm, the court includes this in its standard questions and sees no need to omit it here. The court agrees that question 11 is duplicative of the court's standard question about litigation, but question 15 is not wholly duplicative, since it asks about accusations of medical malpractice, not just lawsuits, so the court has omitted plaintiff's proposed question 11 but included question 15.

Defendant argues that questions 12, 13 and 17 would permit plaintiff to argue the merit of his case, but these questions seek to elicit whether panel members may have biases related to the facts of this case. However, the court agrees that proposed question 18, asking about the deliberate indifference standard for prisoners, is irrelevant to the jury instructions, so that question has been omitted.

Finally, the court has highlighted Dr. Martin as a possible witness, but will reserve on the admissibility of his deposition testimony pending review of his actual, proposed testimony.

## II.   Jury Instructions

The court's proposed jury instructions assume that the trial will not be bifurcated

and include its standard instructions and the majority of the parties' proposed instructions. Unless the parties provided specific arguments in favor of a pattern instruction, rather than the court's standard instruction, the court has used its standard instruction. Here is how the court is resolving the parties' disputes.

First, the parties dispute the statement of the case. The court has modified plaintiff's version of the introduction in response to defendant's objection, again with placeholders for the inclusion of a possible negligence claim. Defendant also objected to the deposition instruction in the introductory instructions, since she is objecting to the admission of Dr. Martin's deposition. Since the court has reserved on this question for further argument at the final pretrial conference, the court reserves on this objection as well and instead puts it in brackets. Defendant also objects to plaintiff's use of the phrase "as a direct result of the failure to provide plaintiff adequate medical care" in the compensatory damages instruction. Accordingly, the court's proposed instruction uses the phrase "as a direct result of Griggs' wrongful conduct." Finally, the court proposes to give its standard punitive damages instruction.

## III. Special Verdict

The court's proposed special verdict form consists of five questions, representing one question each for Carter's Eighth Amendment and negligence claims, one question for the measure of compensatory damages and two questions for punitive damages.

The parties' most significant dispute relates to the timeframe covered by the questions. Defendants seek to narrow the questions in the verdict form to just Griggs'

3

treatment on May 7, 2013, but Carter's claim against her is broader than just that visit. He was allowed to proceed against Griggs for her alleged failure to refer him to a physician that day, as well as for her alleged failure to provide adequate treatment during subsequent visits. Accordingly, the special verdict form does not limit the time frame for consideration to May 7, 2013. Additionally, the parties dispute how to describe Griggs' conduct. Consistent with this court's practice, the court's special verdict simply asks whether Griggs violated Carter's Eighth Amendment rights and acted with negligence. In closings, both sides are welcome to point to the jury instructions and facts in arguing that the answer to a question should be "yes" or "no."

IV. **Motions in limine**

   A. **Plaintiff's motions in limine (dkt. #99)**

Plaintiff requests two rulings. *First,* plaintiff requests exclusion of evidence related to Carter's crime of conviction, both as substantive evidence and for impeachment purposes. *Second,* plaintiff also requests exclusion of any evidence related to any disciplinary actions taken against plaintiff during his incarceration, since such evidence would be irrelevant and unfairly prejudicial. Defendant has not responded to either motion, so they will be granted as unopposed.

   B. **Defendant's motions in limine (dkt. #103)**

*First*, defendant seeks to exclude argument or evidence regarding causation of physical injury, permanence, future care and treatment, or future pain and suffering. Her position is that while a plaintiff may testify about his present health conditions, lay

4

witnesses cannot opine about whether an incident caused physical health problems or suggest a medical diagnosis. Defendant's position is that Dr. Icenogle's testimony should be excluded, leaving plaintiff with no evidence in support of a damage award for permanent or future injury. Plaintiff responds that Dr. Icenogle is qualified to testify about these issues, and the court agrees, for the reasons explained below. Furthermore, plaintiff correctly points out that while Carter will not opine about issues that are appropriate for medical experts, he may testify about his own perception of his physical and mental health, if directly related to his shoulder injury. Accordingly, this motion is DENIED.

*Second*, defendant seeks to exclude any arguments, requests, testimony or evidence of the reputation of the Wisconsin Department of Corrections based solely on speculation and hearsay. Since plaintiff does not object, this motion is GRANTED.

### C. **Defendant's motion to exclude testimony of Daniel L. Icenogle (dkt. #104)**

Defendant seeks to exclude the testimony of Dr. Daniel L. Icenogle, the expert plaintiff designated to offer an opinion related to Griggs' treatment of Carter's injury. The standard for reviewing this challenge is a familiar one, principally governed by Federal Rule of Evidence 702, as elucidated by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

In applying Rule 702, a district court is to function as a "gatekeeper," determining whether a party's proffered expert testimony is relevant and reliable. *Daubert*, 509 U.S. at 589; *see also United States v. Johnsted*, 30 F. Supp. 3d 814, 816 (W.D. Wis. 2013) (expert testimony must be "not only relevant, but reliable"). Although "liberally admissible under the Federal Rules of Evidence," *Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719, 723 (E.D. Wis. 2008), expert testimony must, therefore, satisfy the following three-part test:

(1) the witness must be qualified "as an expert by knowledge, skill, experience, training, or education," Fed. R. Evid. 702;

(2) the expert's reasoning or methodology underlying the testimony must be scientifically reliable, Daubert, 509 U.S. at 592-93; and

(3) the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702.

*Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). Still, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

Dr. Icenogle is a board-certified physician in Family Medicine and practiced in Urgent Care for ten years and emergency medicine for seventeen years. To prepare his report, Dr. Icenogle reviewed (1) a copy of Carters medical records from the DOC, (2) a chronology of Carter's medical records, (3) a copy of Carter's February 5, 2019, deposition,

and (4) copies of Griggs' and Dr. Martin's March 15, 2019, depositions, and he examined Carter on May 7, 2019. In his report, Dr. Icenogle noted that in 2014, Carter was diagnosed with a Grade III shoulder acromioclavicular ("AC") joint separation by Dr. Duellman, an orthopedic surgeon at Wisconsin River Orthopaedics.

However, Dr. Icenogle opined that Carter may also suffer from a torn rotator cuff, based on Carter's reported pain and limited range of motion. In reaching this opinion, Dr. Icenogle acknowledges that a rotator cuff tear can be difficult to identify without proper imaging, such as an MRI, CT or MRI arthrogram, which Carter did not undergo. With respect to Griggs' treatment decisions in 2013, Dr. Icenogle opines that defendant Griggs delayed Carter's access to proper care by failing to properly document her assessment of him on May 7, 2013, and failed to obtain x-rays and consider the need for follow-up. (Icenogle Rpt. (dkt. #90) 4.) He further opines that it is possible that Griggs' failure to order a work restriction may have worsened his condition  Dr. Icenogle concluded that Carter "will continue to be disabled by a chronically painful and limited right shoulder" as a result of Griggs' failures. (Icenogle Rpt. (dkt. #90) 5.)

During his deposition, Dr. Icenogle testified that an AC separation injury -- like Carter's injury -- is a common injury for which all family physicians and emergency room physicians receive training. (Icenogle Dep. (dkt. #98) 17.) He further testified that he routinely encounters this type of shoulder injury and periodically reviews the physical diagnoses of shoulder injuries in general. (*Id.* at 17-18.) While Dr. Icenogle testified that he felt qualified to recommend physical therapy, he acknowledged that that he was not qualified to opine as to whether Carter needed surgery versus physical therapy, and would

7

defer to an orthopedic specialist on that point.  (*Id*. at 84, 87.)

Defendant claims that Dr. Icenogle's testimony should be excluded because he is unqualified, his opinions are unreliable and his opinions include inappropriate credibility determinations

### 1. Dr. Icenogle's Qualifications

Defendant claims Dr. Icenogle is unqualified to render the opinions outlined in his report, since he has no special training or education related to orthopedic injuries, and he has not authored any publications relating to orthopedic injuries.  Yet, as plaintiff points out, defendant's expert, Dr. O'Brien, is not an orthopedic specialist either, and an expert witness need not possess specialized training to assist the trier of fact.  *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) (physician was qualified to opine on a prisoner's heart-related death, even though he was not a cardiologist).  Likewise, Dr. Icenogle's lack of publications does not render him unqualified to testify about Carter's shoulder injury.  *Smith v. Ford Motor Co.*, 215 F.3d 713, 720 (7th Cir. 2000) ("lack of publication in a peer reviewed journal is not a dispositive consideration").  Dr. Icenogle's representation that his years of experience as an emergency room physician included routine assessments of shoulder injuries adequately demonstrates that he is qualified to render an opinion about Griggs' handling of Carter's injury.  If anything, both sides' experts may be overqualified in opining what steps a nurse like Griggs should have taken.

Defendant further claims that Dr. Icenogle's deposition testimony illustrates a fundamental lack of knowledge of the medical concepts related to Carter's injury that would allow him to testify about the diagnosis, treatment, cause or permanency of Carter's

8

injury. During Dr. Icenogle's deposition, counsel asked him to explain the differences between the grades of an AC shoulder injury, and Dr. Icenogle responded that "it depends on the amount -- the distance by which the end of the acromion is lifted off what's called the glenoid. What's one, two, three, four, I could not pull that out of the top of my head, no." (Icenogle Dep. (dkt. # 98) 36.) Despite defendant's contention to the contrary, this statement does not illustrate a fundamental lack of knowledge about the different grades of an AC joint separation. Instead, it suggests that Dr. Icenogle simply might not have the same level of expertise as an orthopedic specialist does in terms of grading AC separations. Yet Dr. Icenogle admitted that his opinion had certain limitations in light of his lack of training in the field of orthopedic medicine, he did not opine about the degree of Carter's separation, and his opinions do not need to reach a certain degree of certainty or specificity to be admissible. *See Gayton*, 593 F.3d at 619. It will be up to the jury to factor Dr. Icenogle's lack of orthopedic expertise into how much to credit his opinions about Carter's conditions and Griggs' treatment. And, again, the standard is minimum care by a nurse.

Defendant also finds fault in Dr. Icenogle's opinion that Carter may suffer from a torn rotator cuff because he relates it to his own personal experience with an AC separation. Specifically, Dr. Icenogle testified that he believed Carter's pain was different than his own:

> I have a mild AC separation that's scarred in, and my clavicle is --- my AC is slightly tended, and it causes me no pain. However, the associated rotator cuff tear does.

(Icenogle Dep. (dkt. #98) 52.) According to defendant, this is inadmissible lay opinion that informed his ultimate conclusions about Carter's condition. However, Dr. Icenogle's opinions set forth in his report did not reference his own injury, and Dr. Icenogle did not

9

otherwise reference his own injury as a source for his opinion. Furthermore, just after Dr. Icenogle referenced his own injury during his deposition, Dr. Icenogle went on to testify that another care provider, Dr. Foncree, also suspected a rotator cuff injury and requested an MRI in 2014. (*Id.* at 53.) Accordingly, since neither his report nor his other statements during the deposition suggest that he *only* concluded that Carter suffered from a rotator cuff tear based on his personal experience with an AC separation, the court is unpersuaded that Dr. Icenogle's statement about his own injury renders him unqualified.

Finally, defendant claims Dr. Icenogle is unqualified to testify about the diagnosis and treatment for Carter's injury because he admitted he was not qualified to opine about whether Carter needed surgery, would recommend physical therapy instead of surgery, or even challenge Dr. Duellman's decisions. However, Dr. Icenogle has not opined that Carter needed or needs surgery. Accordingly, the court concludes that Dr. Icenogle is qualified to opine about factors that could have worsened Carter's shoulder injury.

### 2. Reliability of Dr. Icenogle's Opinions

Next defendant argues that Dr. Icenogle's opinions are unreliable because, even though he agreed that a patient's recent medical history is relevant to determining the cause of his symptoms, he acknowledged that he was unaware that: (1) in 2015, Carter was lifting 100-pound racks of sausages at work (*id.* at 75); or (2) Carter sought treatment from Aspirus Wausau Hospital after injuring himself at work (*id.* at 74). Nor was Dr. Icenogle aware that Carter never listed his shoulder as a medical problem or complained of shoulder pain to his treating physician. When confronted with all of this information, Dr. Icenogle testified that his opinion remained the same. (*Id.* at 98.) Defendant contends

10

that Dr. Icenogle's failure to adjust his opinion when confronted with these facts establishes that he is offering nothing more than a "bottom-line" conclusion that would not assist the jury. *See Kopplin v. Wis. Cent. Ltd.*, 914 F.3d 1099, 1104 (7th Cir. 2019) (upholding exclusion of expert who "never considered" whether other factors could have caused injury or renewed symptoms); *Clark v. Takata Corp.*, 192 F.3d 750, 759 (7th Cir. 1999).

Dr. Icenogle's lack of knowledge about discrete aspects of Carter's more recent work and medical history may affect the credibility of his opinion of the cause of his condition in 2019, but these gaps are not so significant that his opinions would not assist the jury. *See Golpalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 781 (7th Cir. 2017). For one, plaintiff points out that Dr. Icenogle's opinion is based upon a reliable methodology, combining his physical examination, Carter's self-reported medical history, and opinions of other professionals who examined him. *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1020 (7th Cir. 2000). Furthermore, while Dr. Icenogle's opinion did not change when he was confronted with additional information about Carter, he explained that: he did not have enough information about Carter's activities in 2015 to conclude that his shoulder would have been bothered; Carter had reported hesitance about complaining about his shoulder injury; and rotator cuff tears "tend to wax and wane." (Icenogle Dep. (dkt. #98) 79.) Defendant is free to challenge Dr. Icenogle's explanation as to why his opinion remained the same, but she has not established that Dr. Icenogle has failed to rule out other possible causes of Carter's shoulder condition.

11

### 3. Credibility Determinations

Finally, defendant argues that Dr. Icenogle's opinions are inadmissible because they are based on improper credibility determinations. *See United States v. Hall*, 165 F.3d 1095, 1107 (7th Cir. 1999) ("[T]he credibility of eyewitness testimony is general not an appropriate subject matter for expert testimony because it influences a critical function of the jury -- determining the credibility of witnesses."); *Fields v. City of Chicago*, No. 12 C 1306, 2018 WL 1652093, at *6 (N.D. Ill. Apr. 5, 2018) ("An expert witness may not usurp the jury's function to weigh evidence and make credibility determinations.") (citations omitted). While defendant points to instances in which Dr. Icenogle arguably made credibility determinations, his testimony need only be limited to a certain degree.

To start, defendant takes issue with Dr. Icenogle's opinion that credits Carter's reports of pain to him, Dr. Martin and Dr. Duellman, but did not account for Carter's failure to report shoulder pain in other circumstances. For example, Dr. Icenogle testified that Carter told him that he gave up complaining about pain because he was being ignored, and apparently Dr. Icenogle credited this. (Icenogle Dep. (dkt. #98) 79.) With respect to Carter's past statements to other care providers about his pain and reason for not reporting his pain, the court agrees that Dr. Icenogle may not opine about whether he believed Carter was *actually* in pain on those occasions.

However, given that Dr. Icenogle examined Carter and reviewed Carter's medical records from the DOC, Dr. Icenogle was entitled to form a medical opinion based on Carter's self-reported pain and Carter's statements to him specifically about his physical state during his May 2019 examination. *See Cooper*, 211 F.3d at 1020 ("[T]he accuracy

12

and truthfulness of the underlying medical history is subject to meaningful exploration on cross-examination and ultimately to jury evaluation."). Thus, while Dr. Icenogle may not opine that Carter was actually in pain throughout the entire time period, he may testify that he formed his May 2019 opinion about Carter based on Carter's statements to him at that time, as well as the past records of Carter's complaints of pain. Defendant is free to try to undermine those opinions by questioning him about why Carter had failed to report pain consistently and in all potentially applicable circumstances.

Defendant also argues that Dr. Icenogle made credibility determinations in criticizing inconsistencies in Griggs' record-keeping, both in his report, (Icenogle Rpt. (dkt. #90) 4), and during his deposition (Icenogle Dep. (dkt. #98) 32). Dr. Icenogle's opinion in his report was not that he did not actually believe she examined Carter, but that her record-keeping was inadequate and contained inconsistencies. Dr. Icenogle also pointed out in his report that while Griggs acknowledged that Carter presented with shoulder pain, and testified about the proper standard of care when a patient presents with an injured shoulder, she did not document what would have been "a reasonable or appropriate examination of a painful shoulder." (Icenogle Rpt. (dkt. #90) 4.) This opinion did not contain a credibility determination; rather, it was drawn from his observations of Griggs' record of her examination and premised on the undisputed fact that Carter presented with shoulder pain.

That said, Dr. Icenogle's deposition testimony did appear to cross the line into making a credibility determination about Griggs. Counsel asked Dr. Icenogle whether his issue with Griggs was "with the documentation and not the fact that she checked for range

13

of motion, deformity, musculoskeletal abnormalities, and grip strength?" (Icenogle Dep. (dkt. #98) 33.) Dr. Icenogle responded:

> I have absolutely no idea if she did. And I have reason to think that some of the things she documented were not consistent with the likely examination, particularly the fact that he had pain in his shoulder. So, as I said, I cannot believe that he had a normal range of motion of any -- an active normal range of motion. . . . The point is if she didn't document it -- as you're taught in medical school, if you don't document it, it didn't happen. I don't know what she did. All I know is her documentation was terrible, and so I have no reason to assume that her exam was complete.

(Icenogle Dep. (dkt. #98) 33.) His statement suggesting that he doubted whether she actually had him perform the examination went too far, but it was in response to defense counsel's specific request that Dr. Icenogle make an inadmissible credibility determination. The court agrees that this statement is not admissible, so counsel should avoid this line of questioning. However, the court will not exclude Dr. Icenogle's opinions critiquing Griggs' undisputed record-keeping and treatment decisions. To the extent the parties need further guidance with respect to the limits of Dr. Icenogle's testimony, they may raise specific questions during the final pretrial conference hearing.

## V.  Witnesses

The parties' only dispute related to witnesses will be addressed in a separate sealed order.

## VI.  Trial exhibits

There does not appear to be any disputes related to the trial exhibits.

ORDER

IT IS ORDERED that:

1) Plaintiff Johnson Carter's motions in limine (dkt. #99) are GRANTED.

2) Defendant Carla Grigg's motions in limine (dkt. #103) are GRANTED in part and DENIED in part.

3) Defendant's motion to exclude Daniel Icenogle from testifying at trial (dkt. #104) is GRANTED in limited part and otherwise DENIED as set forth above.

Entered this 25th day of October, 2019.

                                    BY THE COURT:

                                    /s/

                                    WILLIAM M. CONLEY
                                    District Judge